## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GEORGE MCMAHON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-350-SLR |
| | ) |
| MICHAEL ASTRUE, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

Gary Linarducci, Esquire of Lunarducci & Butler, New Castle, Delaware. Counsel for Plaintiff.

Charles M. Oberly, III, Esquire, United States Attorney, District of Delaware, and Patricia A. Stewart, Esquire, Special Assistant United States Attorney, District of Delaware, Counsel for Defendant. Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel, and Jillian Kipp, Esquire, Assistant Regional Counsel of the Office of General Counsel, Philadelphia, Pennsylvania.

## MEMORANDUM OPINION

Dated: June 6 , 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

George McMahon ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security ("defendant"), denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Plaintiff has filed a motion for summary judgment asking the court to remand the case for further proceedings. (D.I. 6) Defendant has filed a cross-motion for summary judgment, requesting the court to affirm his decision and enter judgment in his favor. (D.I. 8) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[1]

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for DIB on September 25, 2006 alleging disability since June 11, 2003 due to "seizures, degenerative disc disease, carpel tunnel, [and] cirrhosis of the liver." (D.I. 5 at 62) Plaintiff was 47 years old on the onset date of his alleged disabilities and 52 years old on the date last insured, or December 31, 2008. (*Id.* at 9, 12) Plaintiff's initial application was denied on March 22, 2007 and upon his request for reconsideration on September 24, 2007. (*Id.* at 56-59, 62-66) Plaintiff requested a

---

[1] Under § 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

hearing, which took place before an administrative law judge ("ALJ") on February 20, 2009. (*Id.* at 15-47) After hearing testimony from plaintiff[2] and a vocational expert ("VE"), the ALJ decided on May 15, 2009 that plaintiff is not disabled within the meaning of the Social Security Act, specifically, that plaintiff can perform other work that exists in the national economy. (*Id.* at 13) Plaintiff's subsequent request for review by the Appeals Council was denied. (*Id.* at 1) On April 27, 2010, plaintiff brought the current action for review of the final decision denying plaintiff DIB. (D.I. 1)

### B. Plaintiff's Non-Medical History

Plaintiff is currently 55 years old. He has a high school education and went to trade school for plumbing. (D.I. 5 at 30) Plaintiff worked as a "plumber/pipe fitter" for thirty-five years prior to his disability. (*Id.* at 21) Plaintiff has not worked since 2002 due to back pain. (*Id.* at 21-22) Plaintiff suffered at least two injuries prior to this date – he once fell twelve feet from a tree and hurt his back again while trying to remove a beam that fell upon him at a job site – but does not attribute his condition to either particular incident, as compared to his laborious work history. (*Id.* at 22)

### C. Medical Evidence

#### 1. Physical impairments

Dr. Irwin Lifrak of the Delaware Disability Determination Service examined plaintiff on March 14, 2007 in connection with his claim for benefits. Dr. Lifrak noted plaintiff's complaints of pain for three years, which plaintiff characterized as severe and generally worsened in cold and damp weather and in the mornings. (*Id.* at 201)

---

[2]By live video.

2

Plaintiff also described mild neck pain. (Id. at 201-02) Plaintiff also reported to Dr. Lifrak that he can climb stairs, sit for up to 4 hours and stand for up to 1 hour during an 8-hour workday. He can also lift 20 pounds with each hand. (Id.) Plaintiff was being treated with Percocet® at that time. (Id.)

Dr. Lifrak noted that plaintiff was able to walk on his heels and toes and get on and off the examination table. (Id. at 203) On physical examination, Dr. Lifrak noted no muscle atrophy, good muscle tone and grip strength. (Id. at 204) Plaintiff's range of motion in the lumbosacral spine was reduced without evidence of muscle spasm. (Id.) Dr. Lifrak's diagnostic impression was degenerative disc disease and possible disc damage. He also diagnosed seizure disorder, while noting that plaintiff reported not having any seizure activity within the last three years. (Id. at 204-05) Dr. Lifrak's medical opinion was that,

> within an 8-hour day while taking usual and customary breaks and without the aid of an assistive device, this individual is able to perform such activities which may require him to walk either indoors or outdoors. He is able to climb stairs. He is able to sit for a total period of up to 6 hours and stand for a total period of 5 hours out of an 8-hour day while taking usual and customary breaks. Additionally, the patient is able to lift weights up to 15 pounds with either hand on a regular basis.

(Id. at 205)

Two physical residual functional capacity ("RFC") assessments appear of record. The first was completed on March 19, 2007 by state agency physician Dr. M. H. Borek. Dr. Borek did not evaluate plaintiff, but relied on Dr. Lifrak's examination. (Id. at 214) Dr. Borek stated that plaintiff reported an ability to sit for 4 hours and lift 20 pounds with each hand occasionally, and could lift 10 pounds frequently. (Id. at 211, 215) He made

3

an objective finding that plaintiff can "sit 6 hours, stand 5/8 hours [and] lift 15 [pounds]

with either hand." (*Id.* at 215) Dr. Borek stated that plaintiff's claim of inability to do any

work activity was "partially credible" and that plaintiff's "max RFC is for light [work]."

(*Id.*) He recommended avoiding hazards (such as machinery or heights) due to alcohol

use. (*Id.* at 213, 215) He also assessed several postural limitations (climbing,

stooping, kneeling, crouching, and crawling). (*Id.* at 212)

Plaintiff received a MRI of the lumbar spine on May 2, 2007 at the request of Dr.

Ian Meyers.[3] The MRI revealed:

> Moderate to advanced multilevel degenerative disk disease especially at L4-L5
> and L5-S1 contributing to moderate bilateral foraminal stenosis, left greater than
> right, at L4-L5, mild bilateral foraminal stenosis at L5-S1, and mild left foraminal
> stenosis at L3-L4. No disk extrusion of central canal or lateral recess stenosis at
> any level.

(D.I. 5 at 320)

A second state agency consultant, Dr. J. Goldsmith, completed a physical RFC

assessment regarding plaintiff on September 19, 2007.[4] The assessment recites

plaintiff's claims that he could sit 4 hours, stand 1 hour and lift 20 pounds in each hand.

(*Id.* at 236) Plaintiff also stated that he could walk about one city block before requiring

rest. (*Id.* at 237) While Dr. Goldsmith found plaintiff "partially credible," Dr. Goldsmith

noted that plaintiff can prepare meals, go shopping, go fishing and visit with family. (*Id.*)

Like Dr. Borek, Dr. Goldsmith determined that plaintiff could occasionally lift 20 pounds

---

[3]At the hearing, plaintiff indicated that he saw Dr. Meyers for approximately six
months prior to seeing Dr. Beneck for pain management. (D.I. 5 at 26)

[4]The record indicates that plaintiff was telephoned in connection with Dr.
Goldsmith's report. (D.I. 5 at 214) Plaintiff states that Dr. Goldsmith never personally
evaluated plaintiff. (D.I. 7 at 5)

4

and frequently lift 10 pounds, could stand or walk for about 6 hours in an 8 hour workday, and sit for a total of 6 hours. (*Id.* at 240, 236) He assessed the same postural limitations as Dr. Borek. (*Id.* at 237)

Plaintiff began treatment with Dr. Stephen M. Beneck of Delaware Back Pain & Sports Rehabilitation Services on October 3, 2007, at which time Dr. Beneck noted as follows. Plaintiff related a history of work injuries, car accidents and childhood injury to his back and that he has had pain for at least three to four years. (*Id.* at 309) Plaintiff at one time suffered from alcohol addiction and suffered seizures, which have ceased since plaintiff has stopped drinking. (*Id.* at 310) He denied other medical problems and rates his pain level in his back as a 10 out of 10. (*Id.*) His symptoms are aggravated by static postures, bending, lifting and twisting. (*Id.* at 309) Plaintiff occasionally experiences pain into his left leg and foot. (*Id.*) He worked with a Dr. Didia "for several years" who prescribed Percocet® (acetaminophen and oxycodone) for pain and, at one time, Duragesic® (fentanyl transdermal) patches, but then weaned plaintiff off of medication. (*Id.*)

Dr. Beneck agreed with the radiologist's interpretation of plaintiff's May 2007 MRI. (*Id.*) Upon examining plaintiff, Dr. Beneck noted a limited lumbar range of motion on all planes, back tightness, a "stiff and labored" gait, significant tightness in the hip flexors, tightness in the hamstrings, weak abdominal muscles and inhibited gluteal contraction on the right side. (*Id.* at 311) Dr. Beneck's impression was chronic lower back pain with radiographic evidence of degenerative disc disease, "significant motion restriction in the back at the joint level" and "significant muscle imbalances, as well as

evidence of a leg length difference." (Id.) Dr. Beneck recommended physical therapy and Rozerem® as a sleep aid. (Id.) Dr. Beneck did not give plaintiff pain medications at that time due to risk of dependancy and in view of "reasonably well" pain management in the last six months without prescriptions. Plaintiff asked for a disability note at that time, which Dr. Beneck declined, pending further treatment/evaluation.[5] (Id.)

Plaintiff continued to treat with Dr. Beneck throughout the relevant time period. (Id. at 246-307) Dr. Beneck consistently found that plaintiff had normal muscle strength in his back, a normal gait, no pain on straight-leg raising, and no indication of problems in plaintiff's arms and legs. (D.I. 5 at 246-47, 255-56, 262-63, 270-71, 277-78, 285-86, 292-93, 298-99, 304-05)

On November 7, 2007, Dr. Beneck noted that plaintiff had been prescribed oxycodone for pain and was participating in physical therapy. (Id. at 306) Dr. Beneck completed a functional capacity assessment in February 2008. (Id. at 244) At that time, Dr. Beneck stated that plaintiff had completed physical therapy for his degenerative disc disease and was currently taking oxycodone. (Id.) He provided that plaintiff can work 8 hours per day, with a maximum of: 8 hours sitting; 2 hours standing or walking; and 4 hours driving. (Id.) Plaintiff can lift up to 10 pounds occasionally. (Id.) Dr. Beneck also stated that plaintiff could spend the following portion of a given workday performing the following movements: 0% bending, turning, twisting, kneeling,

_____

[5]Specifically, Dr. Beneck stated that "I do not know [plaintiff] or his history well enough that he is disabled from all work at this time. I can address this in the future if [he] would like." (D.I. 5 at 311)

6

squatting or crawling; 75% completing repeated arm movements; and 25% reaching above shoulder-level or operating foot controls. (*Id.*) Dr. Beneck opined that plaintiff is unable to return to his prior occupation as a plumber/pipe fitter and has a permanent disability. (*Id.*)

### 2. Mental impairments

In November 2004, plaintiff underwent a consultive psychological evaluation with Dr. Frederick Kurz of the Delaware Disability Determination Service. (*Id.* at 197) Dr. Kurz reported that plaintiff was applying for disability based on seizure disorder and last had a seizure three months ago. (*Id.*) Plaintiff also reported to Dr. Kurz that he has sustained many head injuries in the past due to automobile accidents, and also hit his head during his past seizures. (*Id.*) He reported taking several medications[6] and having depression due to this inability to work. (*Id.*) Plaintiff estimated having 18 seizures within the past several years. (*Id.*) Dr. Kurz noted plaintiff's "long history of alcohol abuse" and that plaintiff claimed to have abstained from drinking for the past three months. (*Id.*)

On examination, Dr. Kurz noted adequate language skills and no indications of thought processing disorders or hallucinating. (*Id.* at 198) Plaintiff was pleasant and cooperative and there were "no overt indications of any depression or anxiety." (*Id.*) He demonstrated adequate attention to complete the examination, which included recalling words and a phrase after a delay, reading, writing a sentence, adding and

---

[6]Phenytonin® (anti-seizure), Endocet® (acetaminophen and oxycodone), Hydrocodo-APAP (hydrocodone and acetaminophen), Lexapro® (depression/generalized anxiety disorder), magnesium oxide (multiple digestive system uses) and Tizanidine® (muscle relaxant).

substracting. (*Id.*) Dr. Kurz administered the WAIS-III examination, and plaintiff

attained a verbal IQ score of 82, a performance IQ of 72 and a full scale IQ of 75. (*Id.*

at 199)

> The 10 point difference between verbal and performance function is statistically significant. It indicates that he generally processes, stores and retrieves verbal information significantly better than nonverbal information. There were relative deficits noted in digit symbol and block design. Digit symbol assesses verbal scanning abilities as well as the ability to learn new nonverbal information. Block design assesses perceptual motor skills. Within the verbal subtest there was a relative strength noted in digit span and information. Digit span measures working memory skills which are necessary for conversation. However his scores indicated that as his tasks became more complex he had increasing difficulty as demonstrated by the deficits that he demonstrated in similarities.

(*Id.* at 199) Plaintiff attained an 85 standard score in the reading subset of the WRAT-

III and placed within the high school range. (*Id.*) In summary, Dr. Kurz noted that

plaintiff "currently functions within borderline levels of intelligence[,] however[,] there

was a significant difference noted between his verbal and performance skills." (*Id.*)

Given those results, Dr. Kurz diagnosed at Axis I "cognitive disorder not otherwise

specified, alcohol abuse," and "seizure disorder" at Axis III.[7] (*Id.*) Dr. Kurz also

assessed a global assessment of functioning of 55, which plaintiff asserts indicates a

"moderate difficulty in social, occupational or school functioning." (D.I. 7 at 6 (citing D.I.

5 at 200; *Diagnostic and Statistical Manual of Mental Disorders ("DSM-TR-IV")* 34 (4th

ed. 2000))

A second state agency psychologist, Dr. Christopher King, Ph.D., completed a

---

[7]Generally, Axis I is devoted to clinical disorders including major mental disorders, Axis II to personality disorders, and Axis III to acute mental conditions. Dr. Kurz made "no diagnosis" of a personality disorder (Axis II). (D.I. 5 at 199)

psychiatric review on March 20, 2007.[8] (D.I. 5 at 217) Dr. King found moderate

limitations in "[t]he ability to understand and remember detailed instructions," to "carry

out detailed instructions," and to "maintain attention and concentration for extended

periods," and otherwise did not note any other significant limitations in understanding

and memory or in sustained concentration or persistance. (D.I. 5 at 228) Dr. King

noted that plaintiff's

> intellectual limitations reflect a moderate limitation . . . and could restrict the
> range of suitable jobs. Nonetheless, he retains the mental RFC for simple,
> routine tasks. His allegations appear to be partially credible, and the MSO from
> Dr. Kurz is given appropriate weight.

(Id. at 230)

## D. Hearing Before the ALJ

### 1. Plaintiff's testimony

Plaintiff testified on February 20, 2009 that he has been sober as of February 29,

2008 and is in rehabilitation. (Id. at 24-25) He stated that Dr. Meyers had given him

medication for seizures, but that he stopped taking seizure medications because he has

not had seizures since he stopped drinking. (Id. at 26) Plaintiff treats with Dr. Benenck

regularly – at that time, every other month. (Id. at 27) He stated that Dr. Benneck

continued him on the other medications Dr. Meyers had prescribed[9] and added a pain

medication to that list. (Id. at 28) Plaintiff testified that, as of the hearing, he was taking

only oxycodone. (Id.) He completed physical therapy at the request of Dr. Benneck

---

[8]It does not appear from the records that Dr. King personally evaluated plaintiff.

[9]Including cyclobenzaprine (muscle relaxant), Lexapro®, oxycontin, Percodan®
(asprin and oxycodone HCl), and Protonix® (reflux). Certain medication names were
not transcribed by the reporter. (D.I. 5 at 28)

9

which did not help, outside of the heat treatment applied to his back. (*Id.* at 29) Only oxycodone provides appreciable relief from plaintiff's pain. (*Id.*)

Plaintiff described his pain as "sharp [and] achy most of the time" in the lower back and off to his left side, below his beltline, which causes difficulty sleeping. (*Id.*) The pain occasionally radiates into his leg or left foot. (*Id.* at 29-30) Plaintiff stated that he can stand for 2 hours before needing to sit down and sit for slightly longer, and can walk a block without stopping. (*Id.* at 31-32) Plaintiff stated that he can lift 10 lbs and, if he lifts more, he would have severe pain. (*Id.* at 33) He lays down for between 30 minutes to 2 hours a day to relieve his back pain. (*Id.* at 34) Plaintiff's activities include fishing and crabbing. When he goes fishing, he moves from sitting to standing and stands generally for about 15 minutes before sitting down. (*Id.* at 36) Plaintiff would like to get back into the workforce, such as doing plumbing estimates, but he feels he does not have appropriate training in business. (*Id.* at 38-39)

### 2. Vocational expert testimony

The hypothetical question that was asked by the ALJ is as follows:

I'd like for you to assume a person who is 48 years of age on his onset date, has a twelfth grade education plus a year of training probably in [the] plumbing industry, past relevant work as indicated. [R]ight handed by nature[.] Suffering, generally, from degenerative disc disease, mostly at the lumbar area. And he has an IQ of 72, according to the record; has 5/5 strength, but he does have moderate pain and discomfort as a result of his back pain and some fatigue and [on] overexertion, all of which are somewhat relieved by his medications, without any side effects. And if I find that, because of his pain, he needs to have simple, routine, unskilled jobs, Mr. Schmidt, low-stress in nature, concentration, memory; but probably he's able to tend [to] tasks and complete schedules; SVP one or two jobs; lift 10 pounds frequently; 20 on occasion; stand for 30 minutes; sit for 30 minutes consistently on an alternate basis during an eight-hour day, five days a week; and would have to avoid heights and hazardous machinery, temperature, humidity extremes, operations; no prolonged climbing, balancing,

stooping; no ladders, ropes, scaffolds, or stair climbing; and he would be mildly lirnited as to push and pull in that left lower extremity, due to the radiation of the pain; but would seem to be able to do light work activities. Are there jobs that would exist with those limitations in significant numbers?

(*Id.* at 42) Based on this hypothetical, the VE testified that plaintiff could perform a limited number of light, unskilled jobs: a laundry folder, garment sorter and recreational aide. (*Id.*) The VE stated that these jobs are both light-duty and have skill and exertional levels consistent with plaintiff's. (*Id.* at 42-43)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil

Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

## IV. DISCUSSION

### A. Regulatory Framework

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the RFC to perform his past work. If the claimant cannot perform his past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is

given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2) & 404.1527(e)(3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

## B. The ALJ's Decision

The ALJ considered the medical evidence of record and testimony received at the hearing, and concluded that plaintiff retains the capacity for work and is not disabled as defined by the Social Security Act. The ALJ made the following enumerated findings.

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2008.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of June 11, 2003 through his date last insured of December 31, 2008 (20 C.F.R. § 404.1571 et seq.).

3. Through the date last insured, the claimant had the following severe impairment: degenerative disc disease (20 C.F.R. § 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equalled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the [RFC] to perform less than the full range of light work as defined in 20 C.F.R. § 404.1567(b). The claimant is limited to occupations that eliminate procedural maneuvers such as balancing, stooping, kneeling, crouching, crawling, and climbing on ropes, ladders and scaffolds and those that require sitting or standing for more than thirty minute periods during the eight-hour work day. The claimant is further limited to occupations that permit only occasional pushing and pulling with the upper and lower extremity due to radiating pain. Additionally, the claimant must avoid hazards such as machinery and heights. Lastly, the claimant is limited to occupations requiring simple, routine, repetitive tasks only involving simple work-related decisions with low stress and few work place changes outside of a fast-

14

paced production environment.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on March 30, 1956 and was 52 years old, which is defined as a younger individual age 18-49, on the date last insured. The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see S.S.R. 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and [RFC], there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. § 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from June 11, 2003, the alleged onset date, through December 31, 2008, the date last insured (20 C.F.R. § 404.1520(g)).

(D.I. 5 at 9-14)

## C. Analysis

Plaintiff argues that the ALJ's determination was not based upon substantial evidence because: (1) the ALJ gave "significant weight" to the opinions of two state agency physicians, who reviewed only one consultive examination report and did not review plaintiff's MRI or treating physician's reports; (2) the ALJ did not consider whether plaintiff's cognitive disorder was a severe impairment; and (3) the hypothetical question to the VE did not include all of the limitations in plaintiff's RFC assessments. The court addresses these arguments in turn.

### 1. Step two: cognitive disorder

At step two, the ALJ noted a history of seizures but declined to find a severe impairment insofar as plaintiff has claimed an absence of seizures since 2004. (D.I. 5 at 10) The ALJ did not appear to consider any other mental disorder at step two. Plaintiff argues that this was in error, especially considering that later in his opinion, the ALJ acknowledged that: (1) Dr. Kurz found "a cognitive disorder not otherwise specified and alcohol abuse" and assessed a GAF of 55; (2) Dr. Lifrak noted that plaintiff functions with borderline levels of intelligence; and (3) Dr. King found "moderate limitations in [plaintiff's] abilities to concentrate, understand and complete detailed instructions and concentrate." (Id. at 11) While the ALJ made no step two finding regarding a cognitive impairment, he did incorporate these limitations into his hypothetical question to the VE.[10] Plaintiff points to no evidence of record indicating that he was unable to perform the jobs identified by the VE (limited to "simple, routine, unskilled jobs, . . . low-stress in nature, concentration, memory"). (D.I. 7 at 12-15) The court finds, therefore, that substantial evidence supports the ALJ's finding at step two.

### 2. Step four: plaintiff's RFC

---

[10]Notwithstanding any conflict created by other evidence of record, namely: (1) plaintiff's indications in his application for benefits that he had no problems remembering, concentrating, understanding, following directions or getting along with others (D.I. 5 at 129); (2) plaintiff's prior indication that he can finish what he starts and follows instructions fairly well (id.); (3) plaintiff finished high school and a year of technical school; and (4) plaintiff worked for many years doing skilled (rather than unskilled) labor. Notably, Dr. Kurz also found that, during his examination, plaintiff was able to follow instructions. (Id. at 198) Dr. King found that plaintiff's only limitation was to work involving simple and routine tasks, due to his moderate intellectual limitations. (Id. at 230)

The chronology of the relevant medical evidence is as follows: (1) Dr. Lifrak's examination occurred on March 14, 2007; (2) Dr. Borek completed his evaluation on March 19, 2007; (3) plaintiff received his MRI on May 2, 2007; (4) Dr. Goldsmith completed his assessment on September 19, 2007; and (5) plaintiff began his course of treatment with Dr. Beneck on October 3, 2007. On these facts, Dr. Borek could only rely on Dr. Lifrak's examination at the time he offered his opinion, as it was the only evaluation of record. Neither Drs. Borek or Goldsmith had the benefits of review of Dr. Beneck's (later) opinion.[11]

The ALJ noted Dr. Lifrak's opinion that plaintiff could sustain work at the light exertional level, and also noted plaintiff's MRI as indicative of "moderate to advanced degenerative disc disease." (Id. at 11) The ALJ stated that Dr. Beneck's functional capacity assessment of February 2008 did not "appreciably alter the medical observations" recited above, as "Dr. Beneck noted chronic lumbar spine pain, normal gait, range of motion and negative standard leg raising[.]" (Id.) Dr. Beneck also noted "few abnormalities but did indicate[ ] anxiousness and pain on flexion and extension." (Id.) The ALJ found plaintiff's statements concerning the intensity, persistence and limiting affects of his symptoms to be not credible to the extent they were inconsistent with Dr. Beneck's assessment. (Id.) In weighing the evidence, the ALJ found as follows:

> Dr. Beneck's opinion of limiting the claimant to sedentary exertional work activity is simply and clearly not supported by the great weight of the medical evidence to the contrary. Therefore, the undersigned accords significant weight to the

---

[11]Dr. Goldsmith does not appear to have cited the May 2007 MRI in the narrative portion of his assessment, and it is not clear that he considered it in forming his opinion.

assessment by the state agency consultant[12] that the claimant is capable of light exertional work activity. However, to the extent the state agency consultant's assessment does not account for the limitations to the claimant's [RFC] as defined and mandated by the medically determinable severe impairments the undersigned disagrees.

In sum, the above [RFC] assessment is supported by the claimant's testimony and indications that he completes activities of daily living, can sit, stand and walk for short periods, and can lift not more [than] fifty pounds.

(*Id.* at 12) (internal citations omitted)

Plaintiff argues that the ALJ "should not have rejected the opinion of a treating doctor based on personal observation and MRI evidence during the time period at issue in favor of an opinion from a non-examining source who never even saw all of the [later-offered] evidence." (D.I. 7 at 9) As plaintiff's treating physician, Dr. Beneck's opinion was to be given great weight if it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [plaintiff's] case record[.]" *See Russo v. Astrue*, Civ. No. 10-2772, 2011 WL 1289132, *5 (3d Cir. Apr. 26, 2011) (citing 20 C.F.R. § 404.1527(d)(2)). In this case, Dr. Beneck's opinion was the only medical evidence of record placing plaintiff's abilities below the light exertional level. Notwithstanding, Dr. Beneck opined that plaintiff could work an 8 hour workday (up to 8 hours sitting, 2 hours standing or walking and 4 hours driving). (D.I. 5 at 244) Dr. Beneck's classification of plaintiff at the "sedentary" work level reflected plaintiff's ability to carry "10 [pounds] max. occasionally." (*Id.*) Substantial evidence of record contradicts this assessment: (1) plaintiff indicated he could carry up to 50 pounds in his application for disability in 2006 (*id.* at 129); (2) Dr.

---

[12]Citation is made to the assessment completed by Dr. Goldsmith.

Lifrak, upon examination, concluded that plaintiff can carry 15 pounds on a regular basis (*id.* at 205); and (3) Drs. Borek and Goldsmith concluded based on Dr. Lifrak's records that plaintiff can lift or carry 10 pounds frequently and 20 pounds occasionally (*id.* at 211, 236, 240). As defendant also points out, Dr. Beneck's own findings during the course of his treatment of plaintiff – that plaintiff had normal muscle strength in his back, a normal gait, no pain on straight-leg raising, and no indication of problems in plaintiff's arms and legs – are also generally inconsistent with his conclusion regarding sedentary work. (D.I. 5 at 246-47, 255-56, 262-63, 270-71, 277-78, 285-86, 292-93, 298-99, 304-05) While plaintiff testified before the ALJ that he could only lift up to 10 pounds, the ALJ was permitted to discredit this testimony as both inconsistent with plaintiff's prior self-assessment and other evidence of record. Finally, while plaintiff is correct that "the opinions of a doctor who has never examined a patient have less probative force as a general matter, than they would have had if the doctor had treated or examined him," Dr. Lifrak's findings (an examining physician) support the ALJ's conclusion. *Brewster*, 786 F.2d at 585 (citation and internal quotation omitted). In sum, substantial evidence supports the ALJ's conclusion at step four.

### 3. Step five: hypothetical question

Plaintiff argues that the ALJ erred in asking the VE to consider jobs involving "no **prolonged** climbing, balancing, [or] stooping" and failing to address kneeling, crouching or crawling. (D.I. 7 at 16) (emphasis in original) Dr. Beneck opined that plaintiff cannot do these activities at all (0% of the workday). (D.I. 5 at 244) As defendant points out, however, the jobs of laundry folder, garment sorter and recreational aide do not, as

defined in the Dictionary of Occupational Titles ("DOT"), require climbing, balancing, stooping, kneeling, crouching or crawling. See DOT I., Code Nos. 369.687-018, 1991 WL 673072; DOT, I. Code Nos. 222.687-014, 1991 WL 672131; DOT I. Code Nos. 195.367-030, 1991 WL 671600. Plaintiff also argues that the ALJ omitted the limitations on pushing and pulling with the right leg, right arm, and left arm, as confirmed by Dr. Beneck who found that plaintiff can perform repetitive arm motions for 75% (or 6 hours) of a work day but can only reach above shoulder level or use foot petals for 25% (or 2 hours) each work day. (D.I. 7 at 17) Although the DOT does not specifically list repetitive arm movements or overhead reaching in connection with the identified jobs, the VE testified that he considered the 75% repetitive arm movement limitation and that there would be "very occasional" (less than 25%) overhead reaching in the jobs identified.[13] (D.I. 5 at 7) Plaintiff does not provide contrary evidence.[14] The court finds, therefore, that substantial evidence supports the ALJ's determination that plaintiff is able to perform (light) work that exists in the national economy.

## V. CONCLUSION

In view of the foregoing, plaintiff's motion for summary judgment (D.I. 7) is

---

[13]The DOT states that there is frequent ("1/3 to 2/3 of the time") reaching involved in all three identified jobs, but does not specify whether such reaching is overhead. The VE stated that the laundry folding and garment sorting jobs can be performed sitting at a bench or table. (D.I. 5 at 45-46) He did not speak to the recreational aide position and, therefore, this determination is not necessarily consistent with Dr. Beneck's recommendations. The court does not remand on this point, however, because the ALJ's determination remains supported by (other) substantial evidence.

[14]Plaintiff waived his opportunity to present a reply brief in support for his summary judgment motion, resting on the arguments presented in his opening papers.

denied and defendant's motion for summary judgment (D.I. 8) is granted. An appropriate order shall issue.